**Frederick BEACH and Vincent Di Rubbio, Plaintiffs,**

v.

**KDI CORPORATION et al., Defendants.**
**Civ. A. No. 4023.**

United States District Court,
D. Delaware.

June 16, 1972.

As Amended June 19, 1972.

See also, D.C., 336 F.Supp. 229.

Peter J. Walsh, and Converse Murdoch, Wilmington, Del., for plaintiffs.

E. N. Carpenter, II, Richard J. Abrams, and William E. Wiggin, Wilmington, Del., for defendants.

## OPINION

STEEL, District Judge:

The background of the present suit and its jurisdictional basis is set forth at pp. 1–5 of the opinion filed December 28, 1971, after a six day trial, a copy of which is attached as an appendix for convenient reference. That opinion left open for later determination several issues to which this opinion is addressed. The first relates to a number of claims for specific damages which defendants assert in a counterclaim against plaintiffs in amounts calculable from the present record. The second is for an accounting under the counterclaim for amounts allegedly due defendants from plaintiffs which cannot be calculated on the basis of the present record. The third is for attorneys' and accountants' fees to which plaintiffs claim they are entitled.

*Claims for Specific Amounts of Damage Based Upon the Present Record*

*Insurance Notes*

Plaintiffs and KDI entered into a reorganization agreement as of January 1, 1969. Under this agreement, plaintiffs, each of whom owned 50 per cent of the stock of Ordnance Products Inc. (OPI) transferred the same to KDI Corporation (KDI) in exchange for minority interest in the stock of KDI, part of

which was delivered at the closing of the agreement on May 20, 1969, and part of which, known as "guarantee shares" and "earn-out shares" was issuable at a later date under § 1(b) (4) and 1(b) (2) of the agreement. Section 5(d) of the agreement provided that:

". . . Corporation (OPI) may sell any life insurance policy on the life of a stockholder at its then cash surrender value in exchange for the purchaser's promissory note due two years after date with interest at the prime rate as charged by the Wilmington Trust Company at the time of purchase per annum."

This provision was inserted as a result of negotiations between plaintiffs and KDI leading up to the reorganization agreement wherein it was agreed that OPI would sell to plaintiffs insurance policies which OPI held on the lives of the plaintiffs under which OPI was the beneficiary, for a purchase price equal to the cash surrender value of the policies. In furtherance of this understanding and § 5(d) of the reorganization agreement, Beach and DiRubbio, on May 13, 1969, executed two promissory notes payable to the order of OPI due two years after date and bearing interest at 7½ per cent per annum; one executed by Beach for $19,092.12 and the other by DiRubbio for $17,171.95. Simultaneously, OPI transferred to Beach and DiRubbio, respectively, the insurance policies having a then cash surrender value equal to the amount of the notes.

Plaintiffs have paid the interest on the notes through May 13, 1971, but the principal remains in default.

Plaintiffs argue that KDI has committed material breaches of the reorganization agreement as a result of which plaintiffs' obligation to pay the notes is discharged [1] or at least plaintiffs' obligation to pay should be deferred until KDI has cured its defaults under the reorganization agreement. Plaintiffs have disavowed any desire to return the policies to OPI in exchange for a return of their notes by OPI (R 555).

Plaintiffs further argue that there has been a failure of consideration supporting the notes. This rests upon the same breaches by KDI of the reorganization agreement. The material breach and failure of consideration arguments overlap and are without merit for the same reasons.

■ Plaintiffs gave the notes to OPI not to KDI. OPI did not breach the reorganization agreement. It was not a party to it. Because KDI may have done so is no reason to discharge plaintiffs from paying their obligation to OPI.

To be sure, the insurance policy transaction between plaintiffs and OPI was entered into in contemplation of the consummation of the reorganization agreement. The notes which plaintiffs delivered to OPI, however, had independent considerations consisting of the cash surrender value of the policies.

Plaintiffs further contend that to require them to pay the notes would be contrary to a verbal understanding which they had with representatives of KDI before the notes were executed. Robertson, a partner of Gunnip & Co., accountants for OPI, explained why a

---

1. Plaintiffs' position is succinctly stated at p. 49 of their main brief as follows:

"KDI has committed a material breach of the Agreement by (1) not delivering additional 'guarantee' shares to Beach and Di Rubbio on January 31, 1971 as expressly required by Section 1(b) (4) of the Agreement, (2) not determining the amount of OPI earnings for the formula period and delivering the earn-out shares due Beach and Di Rubbio on January 31, 1971 as required by Section 1(b) (2) of the agreement, and (3) not registering Beach and DiRubbio's shares under the Securities Act of 1933 as required by Section 6(i) of the Agreement. As a result of these material and substantial breaches by KDI, it is barred from . . . demanding repayment of the insurance loans which were made by Beach and Di Rubbio in contemplation of the Agreement."

two year maturity was fixed. He said that under the reorganization agreement plaintiffs were entitled to receive from KDI in January 1971 the "balance"[2] of the KDI shares which were registerable and that if and when these were sold by plaintiffs, as was apparently contemplated, the sale would generate the cash needed to pay off the notes (R 554). Defendants objected to this testimony on the ground that the parole evidence rule barred its introduction, the argument being that if admitted it would vary the terms of the notes which fixed an unqualified maturity date. Ruling on the objection was reserved and the testimony admitted subject to the objection.

Significant to the parole evidence question is the provision of § 5(d) of the reorganization agreement which fixed a two year maturity date for the notes without conditioning plaintiffs' obligation to pay them upon the performance by KDI of the obligations which plaintiffs claim are in default. Section 5(d) is particularly critical in view of the integration provision embodied in § 16 of the agreement. It states:

"This instrument embodies the entire Agreement between the parties hereto with respect to the transactions contemplated herein, and there have been and are no agreements, representations or warranties between the parties other than those set forth or provided for herein."

■ Under comparable circumstances, parole evidence was held to be inadmissible where its effect was to impart conditions to the performance of an unqualified written contractual obligation, Aetna Insurance Co. v. Newton, 274 F.Supp. 566 (D.Del.1967), aff'd, 398 F.2d 729 (3d Cir. 1971).[3] Such is the present holding.

Plaintiffs must pay the full amount of the notes with interest from their maturity date.

*Excessive Salary Payments*

Defendants claim that plaintiffs are indebted to OPI in the amount of $85,082.35.[4] This represents amounts which plaintiffs withdrew from OPI against accrued salaries owing to them. Defendants assert that the payments were made contrary to plaintiffs' agreement with KDI, in violation of OPI's agreement with its creditors, that they were not disclosed to or approved by KDI, and violated plaintiffs' fiduciary obligation owed to OPI and KDI.

On May 20, 1969, plaintiffs entered into employment contracts with OPI pursuant to the reorganization agreement with KDI. The contracts provided that each of the plaintiffs should receive for his services a salary at an annual rate of $64,500 for a two year period. OPI paid plaintiffs the amounts due them under their employment contracts and in this connection defendants make no charge of impropriety.

OPI's complaint is directed against other payments aggregating $85,802.28 which were made after the consummation of the reorganization agreement on May 21, 1969. OPI concedes that these amounts represented salary accruals which were unpaid. It is defendants' contention, however, that the amounts were not due when the payments were made. That plaintiffs ultimately would have been entitled to the accrued salary payments is conceded by defendants (D. B. 13). It is the premature timing of the payments and the circumstances under which they were made which is complained of.

---

**2.** Reference was made to the "guarantee" shares due under § 1(b) (4), the "earnout" shares due under § 1(b)(2) and the registration obligation of § 6(i) of the reorganization agreement.

**3.** The initial appeal taken from the District Court's decision in 274 F.Supp. 566

(D.Del.1967) was dismissed for lack of jurisdiction, 398 F.2d 729 (3d Cir. 1968).

**4.** The context of the brief indicates that the correct amount of the claim should be $85,802.28.

The $85,802.28 was included as part of the $120,000 shown to be due the officers of OPI as "long term liabilities" on the OPI financial report dated October 31, 1968. Within the terminology of accountancy a "long term liability" is one which by its terms and by agreement of the parties is not due within one year. This report had been prepared by Gunnip & Co., the accountants of OPI, of which Robertson was the chief accounting partner.

Prior to the more serious negotiations between plaintiffs and KDI, Robertson went over the October 31, 1968, report of OPI with the president and other representatives of KDI. There was a rather clear conversation about the fact that there were monies due to plaintiffs for accrued salaries. Furthermore, before the reorganization was consummated KDI had employed Lybrand Ross Bros. and Montgomery to examine the accounting records of OPI. Lybrand's personnel discussed the OPI financial statements and workpapers for the year ending October 31, 1968 with Robertson who had prepared the OPI October 31, 1968 report. Because of these activities, KDI, before the reorganization was consummated, was chargeable with knowledge that OPI on October 31, 1968 owed approximately $120,000 to its officers as "long term liabilities". KDI concedes that it was "constructively" aware of these liabilities (p. 10, DB, Doc. 107).

After May 1969, Lybrand, again acting on behalf of KDI, examined the books and records of OPI for the calendar year ending December 31, 1969. This encompassed an examination of OPI's account balances as of October 31, 1969. These necessarily reflected the fact that OPI had paid plaintiffs $10,000 on December 27, 1968 and $25,500 on January 9, 1969, against officers' accrued salaries under the "long term liabilities" account. If KDI did not have actual knowledge of these payments, Lybrand's knowledge was constructively imputable to it. Before the present suit was begun, defendants voiced no objection to these payments nor do defendants seek to recover them from OPI in this litigation.

Defendants point out that at the time when the reorganization was consummated in May 1969, there existed a loan agreement between OPI (and its subsidiary Martin Electronics) and Florida Industrial Development Corporation, which expressly provided that the total annual compensation payable to plaintiffs would not exceed $85,000 each so long as the indebtedness remained outstanding. They also note that OPI had pledged its accounts receivable with Commercial Credit Corporation under an agreement which contained a similar restriction as to salaries and other compensation from whatever source. By the loan agreements, payments to plaintiffs in excess of these limits was subject to the approval of the lenders.

Defendants argue that under these circumstances it was reasonable for KDI to understand that the long term liability for officers' accrued salaries would not be drawn down by plaintiffs without the approval or knowledge of KDI. The record supports the conclusion that the withdrawals had the tacit approval of KDI since in June or July 1970 Robertson told Mr. Downey, an employee of KDI who was the liaison between OPI and KDI, that plaintiffs had decided to take the balance due them on their accrued salaries (532). Although there was an understanding that there might be later negotiations between plaintiffs and KDI concerning the propriety of plaintiffs deferring the payment of current salaries (see discussion below) these negotiations were to have nothing to do with the payment of accrued salaries for prior years (532–33, 652–53).

In any event, whatever may have been KDI's understanding it does not follow that such was plaintiffs' understanding. This is particularly true since the defendants had expressed no dissatisfaction or objection about the payments OPI had made to plaintiffs on December 27, 1968 and January 9, 1969, even

though they were made within twelve months after October 31, 1968 and with KDI's knowledge. Furthermore, by the time payments complained of were made ($40,000 on April 24, 1970 and $45,802.-28 on July 3, 1970) they had ceased to be the "long term liabilities" shown on the October 30, 1968 statement.

Defendants also argue that the plaintiffs were less than candid, indeed deceptive, when from time to time during the two year period following the reorganization they were asked about the salaries which OPI had been paying them, they replied that they were being paid $64,500 per year in accordance with their employment contracts. It is doubtful whether the inquiry required plaintiffs to say anything about the payment of the salary accruals. As stated, defendants had expressed no dissatisfaction with the payments made to plaintiffs on December 27, 1968 and January 9, 1969, even though they were made within twelve months after October 31, 1968. In any event, defendants do not suggest that OPI was damaged by such deception, if in fact there was any.

Defendants make the further argument, based upon what appears to be the admitted fact, that during the period July–October 1970, the closing months of the "earn-out" period specified in the reorganization agreement, plaintiffs' current salaries were neither paid to them nor shown as accruals on the OPI books. The effect of this omission was to reduce OPI's expenses allocable to salary and increase OPI's earnings which were subject to the earn-out provision, even though plaintiffs were in fact receiving compensation by reason of payments against past salary accruals. This resulted in increasing by a ten to one ratio the amount which plaintiffs would be entitled to under the "earn-out". Mr. Downey, the employee of KDI who was performing liaison functions between OPI and KDI, made no objection to this since it was understood that the matter could be negotiated with KDI prior to October 31st when the earn-out

formula would be finalized. No later negotiations took place on the subject.

Whatever amount was due plaintiffs from KDI under the earn-out provision of the reorganization agreement was never paid to plaintiffs. So that the "device", as defendants characterize it, of plaintiffs neither paying nor accruing current salaries due toward the end of the earn-out period has occasioned neither OPI nor KDI any damage.

Beach testified that it was agreed between plaintiffs and KDI that OPI could pay plaintiffs their accrued salaries "whenever we could pay it out". (Dx 109, p. 19). The context of the testimony discloses that Beach meant whenever OPI's cash position was such as to justify the payment. Defendants contend that when OPI made the payments it was badly in need of money. Plaintiffs controvert this fact. The burden is upon defendants to prove it by a preponderance of the evidence, and in this regard defendants have failed. Exactly how stringent OPI's financial situation was on the payment dates is not disclosed. Whether OPI was required to borrow money as a result of plaintiffs' withdrawals is not shown. Defendants have failed to establish that because of the incurrence of interest by OPI or otherwise they were damaged by what they claim to have been the premature payments of OPI obligations.

### Defective Pricing Claim

In 1971, OPI settled for $114,000 a so-called "defective price claim" against it by the federal government. The claim arose out of sales made by OPI in 1968 and 1969 under government contracts. The government deducted the $114,000 in 1971 from amounts otherwise due to OPI on current sales to the government.

Defendants' claim that plaintiffs should reimburse OPI is based upon Sections 3 and 8 of the reorganization agreement and Schedule 3A attached to it. Section 3 contains representations and warranties by plaintiffs as to OPI's financial condition. Paragraph (c) (1)

(ii) states that OPI has no undisclosed liabilities except those shown on the attached schedules, one of which is 3A. Schedule 3A refers to "potential liability for renegotiation or adjustment on government contracts". The $114,000 claim fell within the "adjustment", and not "renegotiation" category.[5] Since the $114,000 claim related to the period 1968 and 1969, the following provisions of Schedule 3A are applicable:

> "[W]ith respect to any such liability relating to the period from November 1, 1967 to the Transfer Date (as set forth in Section 2 of the Agreement), KDI, at its sole option, shall have the right to reimbursement in the same manner as set forth in Section 8 of the Agreement or to reduce the average annual net after-tax earnings (as defined in paragraph (c) of Section 1 of the Agreement)." [6]

Section 8(a) provides that plaintiffs shall indemnify and hold KDI harmless from any and all damage resulting from any ". . . misrepresentations, breach of warranty, or nonfulfillment of any obligation on the part of Stockholders . . . or any Schedule to this Agreement. . . ."

Schedule 8(b) provides that subject to exceptions not presently relevant:

> ". . . KDI or its subsidiary [OPI] shall be reimbursed on demand for any payment made by it or loss, damage, cost or expense suffered by it at any time after the Transfer Date in respect to any liability or claim to which the foregoing indemnity relates, . . . ."

Schedule 3A does not in terms provide for reimbursement of OPI but only KDI. As reasonably constructed in the light of Section 8, 3A means that plaintiffs are to reimburse either KDI or OPI depending upon the circumstances. Schedule 3A gives KDI an option either (1) to be reimbursed directly or, if the claim idemnified against injures OPI, indirectly through OPI, or (2) if the claim indemnified injures KDI, to reduce OPI's annual net after-tax earnings, which is the basis provided in Section 1(c) of the reorganization agreement for calculating the number of "earn-out shares" issuable to plaintiffs under the agreement. Defendants' argument that OPI should be reimbursed manifests an exercise by it of the first option.[7]

Section 8(e) provides:

> "In determining the extent of Stockholders' liability to indemnify KDI, Corporation [OPI] or Martin pursuant to this Agreement, the net effect of any matter shall be taken into account."

Plaintiffs argue that if they are obligated to reimburse OPI, Section 8(e) requires the tax effect be given to the $114,000 payment and that this has not been done. On the other hand, defendants assert that the $114,000 represents the net amount of the total claim after tax effect had been given to the latter. Revenue Ruling 71–415 relied upon by plaintiffs supports the defendants' view.

Revenue Ruling 71–415 reads in relevant part:

> "Section 1481(a)(1) of the Code provides that in the case of a contract with the United States or any agency thereof, or any subcontract thereunder, which is made by the taxpayer, if a renegotiation is made in respect of such contract or subcontract and an amount of excessive profits received or accrued under such contract or subcontract for a taxable year (referred

---

5. The defective pricing claim did not arise under the Renegotiation Act of 1951, although another contingent claim of the government against OPI, not settled at the time of trial, did.

6. The Transfer Date is stated in Section 2. of the reorganization agreement to be not later than May 15, 1969.

7. It may be doubted whether KDI could have exercised the second option in view of the fact that before January 31, 1971, when the guarantee shares were issuable, KDI became under the jurisdiction of the federal court in Ohio in Chapter XI proceedings.

to in this section as 'prior taxable year') is eliminated and the taxpayer is required to pay or repay to the United States or any agency thereof the amount of excessive profits eliminated or the amount of excessive profits eliminated is applied as an offset against other amounts due the taxpayer, the part of the contract or subcontract price which was received or was accrued for the prior taxable year shall be reduced by the amount of excessive profits eliminated.

\* \* \* \* \* \*

Section 1481(b) of the Code provides that there shall be credited against the amount of excessive profits eliminated the amount by which the tax for the prior taxable year under Subtitle A, of the Code is decreased by reason of the application of section 1481(a)(1) of the Code; and there shall be credited against the amount disallowed the amount by which the tax for the prior taxable year under Subtitle A, of the Code is decreased by reason of the application of section 1481(a)(2) of the Code. Consequently, the taxpayer will, on account of the renegotiation, pay or repay to the United States only the net amount of the excessive profits of a prior taxable year which remain after there has been credited against the excessive profits the amount of Federal income taxes attributable to such excessive profits."

The application of these provisions to the facts of the present case would have required the government to (1) determine the amount of the excess profits which OPI received or accrued as a result of defective pricing in 1968 and 1969 under government contracts, (2) reduce the amount of the excess profits so determined from the amount of the contract price which OPI received or accrued in 1968 or 1969, (3) credit

against the amount of such reduction the amount by which the tax in 1968 and 1969 is decreased by such reduction and (4) require OPI to pay the government (or offset against current billings) in 1971 the "net amount" so ascertained.

In the absence of evidence to the contrary, it must be assumed that this procedure was followed.[8] Accordingly, it is held that the $114,000 was the "net effect" of the defective pricing claim within the meaning of Section 8(e) of the reorganization agreement.

Plaintiffs' final argument is that OPI is barred from obtaining reimbursement from plaintiffs because KDI committed a material and substantial breach of the reorganization agreement. Plaintiffs make the same argument couched in the terms of failure of consideration. Regardless of which of these verbalizations is adopted, the result is the same. Plaintiffs have a valid defense to OPI's claim for reimbursement of $114,000.

Preliminarily, it is to be noted that OPI, and not KDI, claims the $114,000. Counterclaim ¶ 75(b). OPI's claim is under the reorganization agreement to which it was not a party. The rights, if any, which it has are those of a third party donee beneficiary for it supplied no consideration for the agreement.

The reorganization agreement provides for an exchange by plaintiffs of all of their stock in OPI for a minority interest in the stock of KDI. The agreement states that KDI will pay for the plaintiffs' stock in two installments, the first on May 20, 1969 and the second on January 31, 1971. § 1(b)(1) and 1(b)(2). On May 20, 1969, KDI issued to plaintiffs 92,407 shares of KDI common stock valued at $2,525,000 under the formula in Section 1(b)(1). So far as the first installment is concerned, KDI has fulfilled its obligation.

A second installment of shares, known as "guarantee shares", were contingent-

---

8. That it was is at least suggested by the fact that although the defective pricing claim initially asserted was in the neighborhood of $300,000 (Dx 109, p. 139), it was ultimately settled for $114,000. It is, of course, possible that this reduction was due to other than tax adjustments.

ly issuable by KDI to plaintiffs on January 31, 1971, dependent upon the then value of the 92,407 shares initially issued. The parties disagree as to the number of "guarantee shares" to which plaintiffs were entitled. It is unnecessary to determine whether plaintiffs were entitled to 1,371,361 shares as plaintiffs claim or 92,407 shares as defendants argue. As a minimum plaintiffs were entitled to 92,407 shares. KDI has failed to issue any of these "guarantee shares" to plaintiffs.

On December 30, 1970, KDI filed its petition for an arrangement pursuant to Chapter XI of the Bankruptcy Act in the United States District Court for the Southern District of Ohio, Western Division.[9] On June 1, 1972, plaintiffs filed proofs of claim as general creditors in the Chapter XI proceedings. Defendants contend that since prior to January 31, 1971, KDI has been subject to the jurisdiction of the bankruptcy court, and that the plaintiffs' claim for the additional "guarantee shares" is in fact and in law the claim of creditors of KDI and not the claim of secured creditors or stockholders. It is defendants' position that plaintiffs' right to the "guarantee shares" under the reorganization agreement has been supplanted by their rights as creditors in the Chapter XI proceeding and that the intervention of that proceeding before January 31, 1971 made it legally impossible on January 31, 1971 for KDI to issue the "guarantee shares".

 The undertaking by plaintiffs in the reorganization agreement, including the indemnification and reimbursement obligations in Section 8(b) and Schedule 3A were given in exchange for the promises of KDI to issue to plaintiffs the KDI shares specified in the agreement. The failure of KDI to issue the "guarantee shares" constituted a material failure of consideration and breach of the agreement which discharged plaintiffs from their obligation to reimburse OPI. This is so even though the interposition of reorganization proceedings may have rendered the issuance of the shares impossible, and even though the impossibility thus created would constitute a valid defense if plaintiffs had sued KDI for breach of contract. Restatement of Contracts § 274 (1932), Comment a. and b., 6 Corbin on Contracts § 1255 (1962), and Glauner v. Malone, 316 F.2d 291, 294 (3d Cir. 1963), which rests upon the cited Restatement and Corbin authorities. The filing of claims by plaintiffs as general creditors of KDI in the Chapter XI proceeding may have the effect of barring plaintiffs from suing KDI for breach of its agreement to issue the "guarantee shares" (a point which this Court does not decide). It does not, however, foreclose plaintiffs from defending against OPI's claim for reimbursement because of a failure of consideration and material contractual breach resulting from KDI's non-fulfillment of its obligation to issue the "guarantee shares".

*"Premature" Contributions by OPI to the Profit Sharing Plan*

Plaintiffs caused OPI to contribute to the Profit Sharing Plan $32,525.83 on the following dates:

December 1970 — $8,000.00
February 1971 — 8,000.00
April 1971 — 16,525.83

Defendants make a number of contentions why these payments were improperly made and plaintiffs should be ordered to repay the $32,525.83 to OPI. They argue that it was wrong for OPI to make the contributions prior to the end of the "fiscal year" without authori-

---

9. On March 9, 1972, an opinion and order was filed by the District Court which denied the motion of Beach and DiRubbio to dismiss the proceedings. An appeal has been taken to the Court of Appeals from this order.

KDI proposed an arrangement which was rejected by the Referee in an opinion and order dated March 27, 1972. A petition to review the order was filed with the District Court on March 29, 1972 and is pending undecided.

zation of the OPI Board of Directors or disclosure to KDI, during a year in which OPI had no earnings or profits, and in which OPI was sorely in need of cash. Defendants point out that the plaintiffs were beneficiaries of 52 per cent of the payments and argue that the payments were in violation of the fiduciary duties which the plaintiffs owed to the defendants.

Defendants say the Plan itself provides that the contributions shall be made from earnings or profits at the end of the fiscal year. It is not clear exactly to what "fiscal year" period defendants refer. Prior to 1971, for tax purposes OPI was on a fiscal year basis which ended October 31st. This was also the "anniversary date" of the Plan. The fiscal year for tax purposes was changed. In 1970, for the first time, OPI began to report its taxes on a calendar year basis. However, the anniversary date of October 31st for purposes of the Plan continued as theretofore.

Actually, it is unimportant which "fiscal year" defendants allude to. Section 5.01 of the Plan provides:

> "Section 5.01. Within the time prescribed by law for filing the Federal Income Tax return (including extensions thereof) Employer may contribute to Trustees for each taxable year such amounts of money from profits or earnings (current or accumulated) as the Board of Directors may determine, provided, however, that such contributions to the Trust in any year by Employer shall not exceed the maximum amount allowable as a deduction for such year under the provisions of the Internal Revenue Code, or any other similar law limiting such allowable deduction for Federal Income Tax purposes."

This does not limit the time when contributions can be made until after the close of a fiscal year or to a time when the profitability of a fiscal year is foreseeable. It authorizes a contribution within the time prescribed by law for filing the Federal tax return. This is two and one half months following the close of the taxable fiscal year. I.R.C. § 404(a) (6). The Plan contains no prohibition against contributions prior to the tax deadline even though the contributions be interim.

Furthermore, in the fiscal year ending December 31, 1970, OPI and Martin consolidated had a little over a million dollars net income before taxes. The record does not show how these profits were allocated between OPI and Martin. Considering the size of the earnings and the absence of evidence to the contrary, the Court cannot hold that the $8,000 contributed in December 1970 occurred in a year when OPI had a loss.

No detailed study had been made before December 1971 to determine the 1971 profit or loss status of OPI. (289) However, Camardo testified that two factors made it appear that a loss would be sustained for that period. One was an inventory write-off. He said this took place "within the last few months". The other factor was a defective pricing settlement of $114,000 "we have taken at this time . . . as an expense of the operations for this year". (291). The pricing settlement was not reached until June or July 1971. The apparent loss in 1971 came about as a result of year end adjustments. It is doubtful whether in February and April 1971, when the contributions were made, plaintiffs could or should have foreseen that a loss was likely to be incurred.

Furthermore, the Plan authorized contributions from "accumulated profits or earnings". On October 31, 1968, these amounted to $838,923. (Px 23) As stated, in 1970 the consolidated net income before taxes of OPI and Martin was a little over a million dollars. The record fails to show that the accumulated profits and earnings had been exhausted when the challenged contributions were made.[10]

10. Even though 1971 turned out to be a loss year, the contributions which OPI made to the Plan would still be a deductible expense which would benefit OPI in future years to the extent that it had profits in those years. (434)

The only provision in Section 5.01 relating to the amount which OPI might contribute to the trust in a given year was the limitation imposed by I.R.C. § 404(a) (3). It provided that the contributions paid by an employer should not exceed 15 per cent of the compensation otherwise paid or accrued during the taxable year to employees participating in the Plan. The statute apparently had no concern with the source of the contributions, whether from current or past earnings.

There was nothing unusual in plaintiffs authorizing the challenged contributions. Contributions in the maximum amount authorized by the revenue law had been made each year from 1959 through 1970. Whether they were from current or accumulated earnings and profits is not revealed. In some instances they were made in the middle of a fiscal year. The contributions which OPI made in 1970 and 1971 were consistent with practices of long standing.

It is true that all contributions which OPI made under the Plan prior to October 1971 were ratified in October of each year. In view of this uniform conduct it can only be assumed that plaintiffs would have taken the same ratifying action in October 1971 if their incumbency as officers and directors of OPI had not been terminated by KDI in May 1971. In any event, the contributions had the approval of plaintiffs when they were made. Since plaintiffs were two of OPI's three directors, that approval constituted *de facto* Board approval.

KDI had no reason to suppose that profit sharing contributions would not be made during plaintiffs' incumbency in office as they had been in prior years. The fact that plaintiffs did not bring the contributions specifically to the attention of KDI is not significant.

Finally, defendants say that the contributions were improper because in the fall of 1970, OPI began to experience a big cash shortage (Dx 110, p. 37). The record does not disclose whether this was of a long or short duration. Defendants have failed to prove that OPI was injured in any way by this cash shortage, if in fact one existed when the contributions were made by OPI to the Plan.

■ Defendants are not entitled to have plaintiffs repay the $32,525.83 of the Profit Sharing Plan contributions to OPI.

### Claims for an Accounting

In addition to defendants' specific claims discussed, defendants also seek an accounting relating to two items. These are (1) personal advances and loan accounts which plaintiffs had with OPI aggregating $22,246.70, and (2) personal expenses alleged to have been improperly charged to OPI as business expenses. Counterclaim ¶ 75(c) and (d).

Defendants cite Pomeroy's Equity Jurisprudence § 1420 for the proposition that there are three generally recognized instances in which jurisdiction exists in a court of equity to grant an accounting. These are (1) where mutual accounts exist between a plaintiff and defendant, (2) where the accounts are not mutual but are so complicated as to render the legal remedy inadequate, and (3) where a fiduciary relation exists between the parties.

Defendants recognize that the modern pretrial discovery rules have limited the need for an accounting in many instances. They argue, however, that an accounting is particularly appropriate here since the time which normally would have been available to defendants to investigate the subjects through discovery was curtailed by the defendants agreeing, as a tax accommodation to plaintiffs, to an early trial of the matters dealt with in the opinion of December 28, 1971. They argue further that by reason of the nature and state of the records of OPI and the accounting difficulties in tracing many of the transactions engaged in by plaintiffs during their management of OPI, no reliable maximum approximation of the dollar

amounts involved could be ascertained. Because of this combination of circumstances defendants assert that they are entitled to the aid of the Court, sitting in equity, to compel an accounting so that the defendants may develop through "more precise documentary and testimonial evidence" (DB Doc. 107, p. 28) the details needed to determine the precise dollar amount of plaintiffs' liability in the two specified categories.

Plaintiffs concede that in these circumstances a court of equity has jurisdiction to grant an accounting. They argue, however, that under the facts disclosed by the record the Court's jurisdiction to grant an accounting should not be exercised.

The counterclaim was tried on December 9 to 16, 1971. As early as two months before the signing of the reorganization agreement on May 20, 1969, representatives of Lybrand, Ross Bros. and Montgomery, an independent accounting firm which represented KDI, spent approximately three weeks going over the OPI books and records. (715–717). Between May 1969 and December 1971, the same auditors again examined the OPI accounting records. (320–321). During this same period KDI had its own staff of internal auditors. They also had access to the OPI books and records. (321).

In May 1971, KDI took over the management of OPI's affairs. Immediately, it commenced an extensive audit and investigation into the accounting and financial records of OPI. Defendants say that this resulted in substantial corroboration of the concerns previously expressed by KDI accounting personnel. According to defendants, this included, among other things, the fact that the payment of personal and business expenses was not in accord with the salary contracts which plaintiffs had with OPI. (¶ 67, KDI counterclaim, ¶ 9 Matthey affidavit attached as Exhibit A). Since May 1971, the financial books and records of OPI have been under the direct control of KDI.

From May 1969 to December 10, 1971, Camardo, the comptroller of KDI, questioned Robertson, the accountant for OPI, about the records of OPI and found him completely cooperative. When Camardo asked question of Hoffheinz, the comptroller of OPI, about OPI's financial records, he never denied information to Camardo. (323–324). Camardo never sought to elicit information from either of the plaintiffs about the financial records of OPI although he had the opportunity to do so (324–325). During this entire period of May 1969 to December 1971, no person associated with OPI ever refused to answer any questions KDI or any of its representatives put to him about the OPI books and records. (325).

The complaint was filed on November 27, 1970. With the information disclosed by the books and records of OPI available to KDI long before and during this litigation, and with the plaintiffs available to be examined by defendants in the light of the disclosures of the books and records, defendants have had ample opportunity to develop evidence of wrongdoing of plaintiffs, if any existed, in the areas in which an accounting is sought. The basis upon which OPI's affairs may be examined into if an accounting should be granted—documents and testimony—is the same as that which existed before the present aspect of the case was tried.

The need for an accounting, if there is any, has been due to defendants' own failure to pursue diligently pretrial remedies available to them. Under the circumstances, it would be inequitable to require plaintiffs to bear further the burden of this already attenuated litigation. An accounting is denied.

### Plaintiffs' Claim for Legal and Accounting Fees

Plaintiffs claim that they should be reimbursed by either defendants individ-

ually or by the Profit Sharing Plan for the legal and accounting fees which they incurred in connection with the profit sharing controversy. This is so, they argue, since they were successful, at least in part, in defending their administration of the Plan.

Defendants claim that the action which they took on May 21, 1971, to terminate plaintiffs' services as OPI officers and directors likewise had the effect of terminating plaintiffs' services as trustees under the Profit Sharing Plan, and consequently steps taken by plaintiffs thereafter and prior to June 4, 1971 to obtain for themselves and others associated with them the distribution of a portion of the Profit Sharing Plan violated their duties as Profit Sharing Plan trustees. This issue has been decided in plaintiffs' favor. See opinion dated December 28, 1971.

On June 4, 1971, further action was taken by defendants to remove plaintiffs as trustees and to replace them with defendant Eggart, as successor trustee. This action was effective for its intended purpose. Despite this fact, plaintiffs (no longer trustees) refused to turn over the books and records of the trust to Eggart. Beach attempted to justify plaintiffs' action by saying that plaintiffs were "at war with KDI" and that he intended to keep in his possession anything he had until the Court decided whether plaintiffs should get OPI back (Tr. 207). This was an arbitrary, unreasonable and wrongful position for plaintiffs to take. Not until an order was entered on December 15, 1971, requiring plaintiffs to turn over the trust records to Eggart did plaintiffs relinquish their control. Only by so doing did plaintiffs avoid litigating the issue which they, under the pleadings, would have been required to do.

Defendants contended further that the distribution of $14,537.37 which plaintiffs paid to themselves on May 22, 1971, and the efforts which plaintiffs made prior to June 4, 1971, to obtain a further distribution to the fund to themselves by the Wilmington Trust Company, as agent for the trustees, conflicted with their interest as trustees and as beneficiaries, was abortive, and in violation of their fiduciary responsibilities. To the extent that plaintiffs were seeking to have distributed that portion of the fund which represented an appreciation in value between October 30, 1970 and May 21, 1971, defendants' position was sustained; but otherwise it was rejected when the Court held that plaintiffs were entitled to an immediate payment of their vested interests in the fund valued as of October 31, 1970. See opinion dated December 28, 1971.

With the exception of the refusal of plaintiffs to turn over the trust records to Eggart, plaintiffs have taken a bona fide and reasonable position with respect to their trust responsibilities. In part they have been successful in defending their actions. On the other hand, the attacks which the defendants made upon the trust administration were not frivolous, and were sustained in part.

Assuming that the Court has jurisdiction to order one or more of the defendants to reimburse plaintiffs for their legal and accounting expenses, the Court, in the exercise of its discretion, will make no such award to the plaintiffs.

### Conclusion

1. OPI is entitled to a judgment of $19,092.12 against Beach and a judgment of $17,171.95 against DiRubbio in both instances with interest from May 13, 1971.

2. Except as stated in paragraph 1, the counterclaim of defendants will be dismissed.

3. Plaintiffs' application for attorneys' and accountants' fees will be denied.